IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| TRINITY HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:07-CV-593 |
| | ) | |
| OFFICER WISE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Trinity Hunter was granted leave to proceed on a claim that on November 25, 2005, Officer Wise, a former guard at Indiana State Prison ("ISP"), purposely left his cell unlocked so that another inmate could come in and attack him in retaliation for Hunter's complaints that Officer Wise showed favoritism toward African-American inmates. [Doc. No. 29.] Hunter claims that Officer Wise's actions violated his rights under the First, Eighth, and Fourteenth Amendments. [Doc. No. 29 at 8.]

Officer Wise moved for summary judgment, arguing that Hunter failed to exhaust his administrative remedies prior to filing suit in accordance with 42 U.S.C. § 1997e(a). [Doc. Nos. 39, 40.] In ruling on the motion for summary judgment, the District Court made the following determinations: Hunter never filed a grievance regarding Officer Wise's actions; the Indiana Department of Correction's grievance system that was in effect on November 25, 2005, the date Hunter was attacked, required grievances to be filed within 48 hours; Hunter was not physically capable of filing a grievance during this 48-hour period due to the injuries he suffered in the attack; on December 1, 2005, a new grievance system took effect under which a grievance must be filed 20 days from the date of the incident; Hunter was physically and mentally capable of

filing a grievance prior to the expiration of the 20-day deadline that applied under the new grievance system; and it would not have been futile for Hunter to file a grievance. [*See* Doc. No. 67.]

Nevertheless, the District Court found there to be other genuine issues of material fact precluding the entry of summary judgment. [Doc. No. 67.] Specifically, the District Court found disputes as to whether Hunter could have used the new grievance system, given that his injury occurred in late November 2005, a few days prior to the December 1, 2005, effective date of the new grievance process, and relatedly, whether prison officials told Hunter that the new system was not available to him, thus preventing him from exhausting his administrative remedies. [Doc. No. 67 at 17-18.] After the summary judgment motion was denied, both parties moved for an evidentiary hearing pursuant to Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008). [Doc. Nos. 73, 76.] The motions were referred to this Court for a report and recommendation. [Doc. No. 79.] This Court determined that a hearing was necessary to resolve the above factual disputes.[Doc. No. 83.]

On June 28, 2010, the Court held an evidentiary hearing. Hunter was represented by attorney Ilene Smith, and Officer Wise was represented by attorneys Corinne Gilchrist and Aaron Raff. Howard Morton, Executive Assistant at ISP, and Pamela James, Administrative Assistant at ISP, testified on behalf of the defendant. Hunter testified on his own behalf. The defendant also admitted five exhibits: a copy of the grievance policy in effect from May 1, 2000, to November 30, 2005; a copy of the grievance policy in effect after December 1, 2005; and

three documents showing Hunter's location and bed assignment at ISP during the time he was housed there.[1]

I.    **FINDINGS OF FACT**

At the hearing, Morton, who is responsible for overseeing the grievance process at ISP, testified that from late November through the month of December 2005, the prison transitioned from the old grievance policy to the new grievance policy. He testified that beginning the last week of November and for approximately three weeks, the prison ran a video on the offender television station repeatedly to notify them of the changes. He further testified that the prison posted notices at the law library and in all housing units and trained all prison staff on the new system, requiring them to view a video explaining the changes. He testified that from the last week of November through December 2005, the prison was accepting and processing grievances filed under either the new or old system.

He also testified that both the old and new grievance systems offered leeway with respect to time deadlines. Under the old system, inmates had 48 hours from the underlying incident or from the time when they became aware that they had a grievable issue to file a formal grievance. Morton testified that in cases where, for example, the inmate was medically incapacitated until some weeks after the incident or was otherwise unable to file within 48 hours, his grievance would not be rejected as untimely. Under the new system, formal grievances are to be filed within 20 days of the underlying incident, but the policy specifically states that extensions can be granted. Morton testified that he used a rule of reason to allow extensions where inmates were incapable of filing due to a medical issue or had some other extenuating circumstance. The

---

[1] Hunter was housed at ISP from December 10, 2004, to March 3, 2006. (Ex. 1.)

process by which an extension is granted is that the inmate simply files the grievance and if it is received beyond the specified time frame, staff will discuss it with him to determine if he has some extenuating circumstance. If the staff member determines there is a valid extenuating circumstance for filing the grievance late, the grievance will be accepted and processed. Morton further testified that had Hunter filed a grievance under either the new or old system in December 2005 or even later, some relief could have been offered to him. The Court found Morton to be credible and credits his testimony.

Hunter, who testified that he has a GED, became aware of the prison grievance process sometime in early 2005 and was also aware that there was a IDOC employee designated as a grievance officer. He testified that when he was in the prison infirmary in December 2005, he heard "chatter" from the other inmates about changes to the grievance system. This "chatter" caused him to be "inquisitive" and ask the prison guards about the new grievance system. According to Hunter, several unnamed prison guards told him that the new system did not apply to him. He identified one individual by name, Officer Merritt, a male guard who Hunter claims told him something to the effect that he should "just be glad to be alive" and not to worry about filing a grievance. He claimed that Officer Merritt told him that the new grievance policy did not "pertain" to him.

Hunter also testified that during this period he put in written requests with the law library inquiring about the new grievance system, but did not get any response. He did not submit copies of those requests as evidence at the hearing, and he acknowledged on cross-examination that there was no record of any such requests having been made in his file at ISP. He also admitted

4

that he never complained or filed a grievance regarding the alleged lack of a response from the law library, and he had no clear explanation for his failure to do so.

The Court did not find Hunter's testimony credible. First, Hunter's demeanor on the stand, including his facial expressions, suggested to this Court that he was not testifying truthfully. Hunter's credibility was also impeached by the fact that he has been convicted of theft, which is a crime of dishonesty that is probative of a witness's truthfulness. <u>United States v. Smith</u>, 80 F.3d 1188, 1193 (7th Cir. 1996). Hunter was also evasive in his answers, often changing his testimony. For instance, on the issue of whether he had seen the notices that were posted in all the housing units explaining the new grievance system, Hunter claimed that he did not. He initially testified that he never left the infirmary during the three months he was housed there, but when prompted by his counsel, he admitted that he was given recreation time each day where he could leave the infirmary. He then testified that he never took advantage of this time to leave the infirmary, but subsequently changed his testimony to state that he did leave on a few occasions to make phone calls to his family members. It appeared to this Court at various points in the hearing that Hunter attempted to offer whatever testimony he believed to be favorable to his claims, regardless of its truthfulness.

Additionally, Hunter's testimony about Officer Merritt was in conflict with his deposition testimony. At his deposition, he testified under oath that the only prison staff member he could identify by name was a "Miss Moore," who he identified as a female grievance counselor. He claimed at his deposition that "Miss Moore" told him "in a roundabout way" that he should simply be happy to be alive and that the grievance process was unavailable to him. At the hearing, he credited Officer Merritt with making this statement. The Court does not believe that

Hunter's memory somehow improved between the time of his deposition and the time of the hearing.[2]

Furthermore, Hunter's assertions lack any factual support because there are no such individuals matching either name given by Hunter. There is a female Officer Merritt employed by the IDOC, but the parties agree she did not work at ISP during the relevant time period. There is a male Officer Merritt presently employed by IDOC, but the parties agree he never worked at ISP and instead works at the prison where Hunter is currently housed. James testified that there is a male grievance counselor at ISP named Kyle Moore, but he is a heavy-set gentleman who in her opinion could not possibly be confused for a female. The fact that the grievance counselor is male is inconsistent with Hunter's account at his deposition that he had this alleged conversation with a female grievance counselor. In short, Hunter's vague and conflicting testimony about what was said to him and who said was not convincing to this Court.

The Court also finds it inherently incredible that Hunter would put such stock in the statements of the prison guards, as he claims. He testified that he was deeply paranoid during this period as a result of the attack; indeed, in this lawsuit he charges one of the guards with purposely leaving his cell unlocked in order to facilitate the attack, a serious allegation of misconduct. In light of these circumstances, it strains credulity to believe that Hunter would simply accept the word of the guards without question, declining to pursue his administrative remedies.

---

[2] Indeed, Hunter testified at the hearing that he takes medication for epilepsy, which affects his memory. He further testified that he was taking medication at the time of the deposition.

Moreover, Hunter's testimony, even if accepted, does not show that prison staff engaged in affirmative misconduct that prevented him from filing a grievance. At best, Hunter's testimony was that certain staff members dissuaded him from filing a grievance. There was no evidence presented that Hunter requested a grievance form and prison staff refused to provide it to him, that he tried to submit a form and prison staff refused to take it, or that they otherwise stopped him from filing a grievance. As Hunter admitted, he never even tried to file a grievance so he can only speculate whether his grievance would have been accepted and processed. He also admitted that some months after he left the infirmary, he had an opportunity to review the new grievance policy (which specifically provided for extensions of the 20-day filing deadline), but he still did not attempt to file a grievance. He had no clear answer regarding why he failed to do so.

## II. CONCLUSIONS OF LAW

Pursuant to the Prison Litigation Reform Act ("PLRA"), prisoners are prohibited from bringing an action in federal court with respect to prison conditions until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The failure to exhaust is an affirmative defense on which the defendant bears the burden of proof. Dole v. Chandler, 438 F.3d 804, 809 (7th Cir. 2006). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002). "[U]nless the prisoner completes the administrative process by following the rules the state has established for that process, exhaustion has not occurred." *Id.* at 1023.

Nevertheless, inmates are only required to exhaust administrative remedies that are "available." Woodford v. Ngo, 548 U.S. 81, 102 (2006); Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006). The "availability" of a remedy is not a matter of what appears on paper, but rather whether the process was in actuality available for the prisoner to pursue. Kaba, 458 F.3d at 684. When prison officials prevent inmates from using the administrative process, such as by failing to provide him the necessary forms, administrative remedies are not considered to be available. *Id.* In essence, "[p]rison officials may not take unfair advantage of the exhaustion requirement . . . and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." Dole, 438 F.3d at 809. In determining whether an administrative remedy was available, the bottom line is whether the inmate did "all that was reasonable to exhaust" under the circumstances. Id. at 812.

Here, the defense established that there were administrative remedies available to Hunter, which he never pursued. Hunter has not countered this evidence by showing that the grievance process was unavailable to him. His testimony that certain unidentified prison staff members dissuaded him from filing a grievance was not credible; even if it were, it does not show that Hunter did "all that was reasonable" to exhaust but was prevented from doing so by prison staff. Dole, 438 F.3d at 812. At best, he made some vague inquiries about the new grievance process, and then opted not to pursue the issue further.

The record also establishes that the prison had authority to take action with respect to a grievance filed beyond the time deadlines specified under either policy, which required Hunter to at least try to obtain this relief. *See* McCoy v. Gilbert, 270 F.3d 503, 511 (7th Cir. 2001) (where

8

prison "had authority to take some sort of action with respect to a tardy complaint," inmate was required to make an attempt to file late grievance). Hunter apparently believed it would have been futile to do so, but "no one can *know* whether administrative requests will be futile; the only way to find out it is to try." Perez v. Wisc. Dep't of Corrs., 182 F.3d 532, 536 (7th Cir. 1999) (emphasis in original). In summary, the Court concludes that Hunter did not exhaust his administrative remedies due to his own failings and not due to any affirmative misconduct by prison staff that prevented him from exhausting. Because Hunter did not satisfy the exhaustion requirement before bringing this lawsuit, the case is subject to dismissal.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the case be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies pursuant to 42 U.S.C. § 1997e(a).

**NOTICE IS HEREBY GIVEN** that within 14 days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b). Failure to file objections within the specified time waives the right to appeal. *See* Thomas v. Arn, 474 U.S. 140 (1985); Lerro v. Quaker Oats Co., 84 F.3d 239 (7th Cir. 1996).

SO ORDERED.

Dated July 8, 2010

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge